LAND, J.
Floyd Williams was in- January, 1903, on his own sworn application, in which he stated that he was a major, employed by defendant company as a brakeman. He was in truth about 19 years old, but was a man in physique, weighing 150 pounds. .He served as a brakeman until April 11, 1903, when, in operating a switch at a spur track, he fell in front of a freight car and lost his right arm. The accident occurred at Tickfaw Station, while a “running switch” was being made.
This suit was brought by the mother, individually and as tutrix. Pending the suit, Floyd Williams became of age, and made himself a party in his own name.
The essential allegations of the petition bearing on the question of negligence may be summarized as follows: The switch failed to work properly, and by reason thereof Williams was precipitated on the track, and was run over by two coal cars which were being switched from the main track to the spur track, and thereby suffered severe bruises and wounds on the head and body, and lost his right arm.
Williams was, at the time of the accident, an able-bodied .youth about 19 years of age, and had been in the employ of the-defendant company about six months, and earned $2.50 per day for such time as he worked.
That the order given by the conductor to make such running switch was in direct violation of standard railroading rules.
That the switch in question was a defective specimen of “an old, antiquated and dangerous pattern,” and that the ground around said switch was rough and uneven, making a sure footing difficult to obtain; all of which conditions were well known to the officers and agents of defendant company.
The answer of the company was a general and special denial of the allegations of the petition, coupled with averments that the conductor was a careful, prudent, and experienced employe, and that the injury com *15 plained of was due entirely to Williams’ carelessness, negligence, and awkwardness.
The ease was tried before a jury, and there was a verdict and judgment in favor of Mrs. Williams for $1,895, and in favor of her son for $7,500.
Defendant company appealed.
In his sworn application for employment as “brakeman,” Williams stated that he was 21 years old, 5 feet 9 inches in height, and weighed 140 pounds. He further stated that his last employment was that of “lineman” with the “Cumberland Telephone and Tel. ■Company.” A surgeon’s certificate to the effect that Williams was qualified to fill the position of “brakeman” formed a part of the application.
Hence, in considering this case, it must be assumed that Williams was competent, mentally and physically, to discharge the duties of the position he sought, and that, as far as he himself is concerned, he must be treated as of full age at the time he entered the employment of defendant company.
Williams worked as brakeman from January 1, 1903, until he was injured on April 11, 1903. On that occasion Williams was head brakeman, and it was his duty, as such, to throw the switch for the pulióse of placing two coal cars on the spur. Williams took his position at the switch, and then some words passed between him and the conduct- or. They differ materially as to what was said and done at the time. Williams’ version is as follows:
“Q. Now, what did Mr. Kennedy say to you at the time he was there by the switch?
“A. He asked me how that switch threw. I told him I reckoned it was all right. He told me to be careful and not to ditch any cars.”
Kennedy, who was called as a witness for plaintiffs, testified as follows:
“After the engine had backed by over the switch to uncouple the cars, Williams remained at the switch for the purpose of throwing it. I walked up to him and spoke to him, and asked him to try the switch and see how it worked, and he threw it. After he threw the switch I asked him, ‘How does it work?’ He said, ‘It works a little bit hard, but I can throw it.’ I told him, ‘If you think you can’t throw it, don’t throw it.’ He said he thought he could throw it all right. Then I signaled the engineer to back, and the switch was made.”
Williams denied that he threw the switch. When questioned as to the reason why he did not try the switch, he replied that he did not have time. This was certainly not the true reason, as the operation required only a few seconds, and some minutes were probably consumed in getting everything ready for the switching of the two coal cars.
No one saw how the accident happened, and plaintiff’s version of it is as follows:
“I was the brakeman at the switch at the time. I was supposed to throw the switch. The engine backed and cut off the cars, and, when the engine passed, I made an attempt to throw the switch. The switch was pretty hard to bring up, and when it got standing straight up it wouldn’t go over, and I had to throw my whole weight upon it to push it over; and, while 1 had my whole weight against it, it gave way all of a sudden, and threw me right across the rails. I jumped back and threw my hands back, so as to draw myself from across the rails; but I didn’t have time to get myself entirely out before the cars reached me, and the wheels passed over my arm, and something struck me in the head. * * * When I threw my weight on that switch, so as to shove it over, it dropped down suddenly, and, of course, when it did, I just went head over heels. I mean, I went over, and fell right across the rails. It broke my watch. I had my watch in this pocket (indicating fob in his trousers’ pocket), and, when I fell, it struck the rail and broke all to pieces.”
As a matter of fact, the switch was thrown by Williams, and the cars passed, on the spur track. Kennedy, the conductor, testified that a few minutes after the accident he threw the switch back into its original position, and found no defect in it; that it threw possibly a little hard, but not enough to be noticeable. He further testified that Williams “claimed that his hand slipped off the switch lever, and that he fell with his arm across the railroad track, and the wheel passed over it.”
Dr. Hinkle testified that, on the night of the accident, Williams said “that his hand slipped from the lover, and that he fell un *17 der the wheels.” Barnes, a hrakeman who was present on the same occasion, testified to the same effect.
Hence it appears that, soon after the occurrence, Williams gave no other explanation of the cause of the accident than the slipping of his hand.
Plaintiff put Kennedy, the conductor, and a number of other railroad men on the stand.
McIntyre, a hrakeman, testified that he had often used the same switch; that “it came up pretty hard and came down easily”; that “it didn’t take no power to shore it down”; that he did not think it safe to make a close switch, but that he knew of no reason why a running switch could not be made at this point with safety, if ordinary care was exercised by the operator.
Hayes, a conductor, another witness for plaintiff, testified that he had used the switch in question since the date of the accident, that it was in good condition, and that it was in suitable condition to make running switches, if proper precaution was used.
All the witnesses for plaintiffs and defendant testify that no accident ever happened at the switch in question before Williams was injured.
Munch, the section foreman, testified that he examined the switch the morning after the accident, and found it in good condition. Manor, road supervisor, called in behalf of plaintiffs, testified that the switch was a new one put there in December, 1902, and, like all new switches, worked a little stiff; and, further, that it was the safest and strongest ground switch the company had in use. This witness further stated that such switches had been used by defendant company since 1891 or 1892, and were still being used.
Some of the brakemen testified that they could throw the switch with one hand, and Mr. Manor, the road supervisor, said the same, adding that it was “a twenty-five or thirty pound raise” — to indicate the force-required.
In the face of all this testimony, much of it coming from witnesses placed on the stand by plaintiffs, and therefore vouched for as credible, it is impossible to find as a matter of fact that the injuries complained of were-due to the defective condition of the switch.
Plaintiff’s son threw the switch and fastened it. The switch was therefore not broken or out of order so that it would not work. The lever probably worked more easily when-it was descending. But as the lever was all the time exerting force to more the switch rails into their proper position, we do not understand how it could drop down or give-way suddenly in such manner as to throw the operator across the rails. Williams must necessarily have retained his hold of the-lever until it was level with the tie and fastened by the hasp. He must have fallen after the switch had been completely thrown and had done its work. His first explanation was that his hand slipped. The petition does-not allege how the accident happened, but attributes it directly to the defective condition of the switch, and the. rough and uneven-condition of the ground, making a sure footing difficult to obtain. The evidence fails-to show such alleged condition of the ground, and does show that the switch was in its-usual working order, and had been used hundreds of times by other brakemen without accident.
According to Williams’ last version given-on the, trial, he threw his whole weight against the lever when it was straight up, and it gave away suddenly, and he was thrown across the rails, presumably face forward, as his watch in the fob pocket of his trousers struck the rail and was broken.
Williams’ statement, made at a time not suspicious, attributed the accident to the slipping of his hand. We find in the surgeon’s-report the following statement as to the-cause of the injury as given by Williamsr. *19 “Making running switch, hand slipped from lever while closing switch; switch was hard to close; I fell and had arm crushed.” Dr. Hinkle testified that the report was correct. Barnes, who was present at the time, corroborated the report as to Williams’ statement. The necessary inference from the statement made by Williams immediately after the accident is that his hand slipped because the lever was hard to work. I-Iis testimony is that the lever dropped suddenly when he threw his whole weight on it. The necessary inference is that the lever worked too easily, or that he exerted too much force against it. The lever was a simple mechanical device, entirely under the control of Williams, and, as it was not broken or out of order, it seems conclusive that his fall was due to want of care in operating the lever, or to an accidental slip or fall liable to occur independently of the particular condition of the switch.
- Williams was a young man of good physique and fair intelligence, with more than three months’ experience as a brakeman. During this time he must have thrown many switches, and must have known how they usually worked.
On the occasion in question, the conductor testified that Williams tried the switch. Williams denied this, but admitted that the conductor asked him how the switch worked, and that he replied that he reckoned it was all right. In short, his attention was called to the matter of the working of the switch, but he did not take the trouble to try it, although he stated it was one which he had never handled before. If, as shown by the evidence, this same switch had been thrown by other brakemen, without accident or injury, hundreds of times, there was no rea- ’ son why Williams, in the exercise of ordi-' nary care, should not have thrown it with safety to him'self on the occasion in question. The danger of falling on the track was apparent, but this danger was avoidable by ordinary care on the part of the operator. Williams had ample time to throw the lever, as was demonstrated by the fact that he fell in front of the foremost coal car.
The making of the running switch was the primary, but not the proximate and immediate, cause of the injury. The only danger to the switchman in such an operation arises from the fact of the proximity of the end of the lever to the rail. If he is slow in closing, he may be struck by the ear.
If the proximate and immediate cause of the injury can be traced to the want of ordinary care and caution of the person injured, an action for the injury cannot be maintained, unless it further appear that the defendant might, by the exercise of reasonable care and prudence, have avoided the consequences of the injured party’s negligence. Grand Trunk Ry. Co. v. Ives, 144 U. S. 408, 12 Sup. Ct. 679, 36 L. Ed. 485.
We are not prepared to hold that the making of running switches is negligence per se, and, even if such were the law, in the instant case the accident would not have happened had it not been for the negligence of the sufferer in operating' the lever.
The work of' the brakemen on freight ears is dangerous at all times, and they assume the risk of slipping or falling while performing the duties of their hazardous occupation.
We are averse from disturbing the verdicts of juries on issues of fact in cases like this, but it is our duty to do so when the finding is clearly wrong, and founded on sympathy rather than on evidence.
It is therefore ordered, adjudged, and decreed that the verdict and judgment appealed from be annulled, avoided, and reversed, and the plaintiffs’ suit be dismissed with costs.